Fletcher, J.
The plaintiff in his declaration, which is in trespass on the case, alleges that he had a horse-shed standing on a certain parcel of land in the south parish in Reading, with a right to occupy the land with the shed, undisturbed, and free from all interference of any person whatever, and that the defendants tore down and carried away the plaintiff’s shed, and hindered and disturbed and deprived the *244 plaintiff of Ms rights to use and improve the premises for the purposes aforesaid. The plaintiff does not claim to own the land in question in fee, but only claims an easement in it, or right to occupy it with a horse-shed for the convenience of attending public worship at the parish meeting-house, near which the land and shed were situated, and the action is for an alleged disturbance of this supposed easement.
The defendants, in their specification of defence, set out in effect, that the land in question belonged to the parish; that the plaintiff placed his horse-shed upon it, by the license and permission of the parish; that the plaintiff had no right to keep his shed on the land against the will of the parish; and the parish had the right at any time to require the plaintiff to remove his shed from the land; that the defendants were a committee duly appointed by the parish for the purpose ; and that they, in behalf and by the authority of the parish, notified and required the plaintiff to remove his shed from the land, and the plaintiff failing and refusing to comply with this request and to remove his shed, the defendants, as such committee of the parish and by the authority and direction of the same, removed the plaintiff’s shed, which is the act complained of in the plaintiff’s declaration.
The question therefore is, whether the plaintiff had the right to retain his shed on the land, as against the parish, or whether the parish had a right to cause it to be removed, the plaintiff himself failing or refusing, upon due notice and request, to remove it. The case comes before the court upon a report of a huge mass of records and documentary and oral evidence, through which the court are left to grope their way to find out the facts of the case, and “ to render such judgment as the law and the evidence may require.” The case was very elaborately argued by the counsel, but there will be no occasion particularly to consider, or even to refer to, many of the points, which were raised and largely discussed at the bar, and no point must be supposed to have escaped the attention of the court, because it is not made the subject of particular consideration. It would be an unprofitable labor to discuss those points wMch are regarded by the court as having *245 no bearing upon the merits of the case; but the view taken of them by the court will sufficiently appear in the course of the opinion. A full and extended examination of the mass of evidence, with a particular statement of the views taken of it by the court, would require great labor, occupy a large space, and would serve no valuable purpose.
The decision of the case will be made sufficiently "dear and intelligible, by stating the conclusions at which the court have arrived as to matters of fact, and the principles of law applicable to those facts upon which the decision rests.
It appears that there were in the town of Reading, scattered about in different parts of the town, several parcels of common land, that is, land which did not belong to any individuals, and did not belong to any distinct body of proprietors of common lands, but belonged to the town in its corporate capacity. The town, in public town meetings, from time to time, passed votes in relation to these common lands.
In 1737, the town chose a committee “ to lay out all necessary ways and watering-places and all other conveniences, that shall be thought convenient for all the proprietors in the town through the town common.”
In 1741, the town voted, “that the common land in the Wood End, from the north side of the burying-plaee from the road running east to John Boutell’s land, and so running south to the corner where two roads meet, shall lie forever for the use of that part of the town for a burying-place, and other public uses as they shall have occasion.” The land here described embraces the locus in quo.
It was insisted on the part of the plaintiff, that the town by this vote granted away or dedicated, as it was called, this parcel of its common land, so that it could not afterwards assert a title to the same. But this position cannot be maintained, as such clearly was not the intention or effect of that vote. In determining the effect of that vote, the circumstances of the case and the object in view must be regarded. The town no doubt thought it wise to come to sdme definite conclusion, as to what disposition should be made of its common lands; whether they should be sold, or.whether they should *246 be permanently retained by the town for its own use. The result was a determination to sell several parcels other and distinct from the parcel now particularly in question. This vote was in effect a decision of the town not to sell this portion of the common land, but to keep it for its own use.
The vote does not import that the town intended to give or grant away this particular parcel of land, so as to deprive itself of a right to it, and control over it, but only that the town intended to keep it for the more particular use of that part of the town in which it was situated. That this was the understanding and purpose, is manifest from the subsequent acts of the town and of the inhabitants of that part of the town where the land was located.
In 1765, upon the application, as it would seem, of the inhabitants of the neighborhood, the town voted to allow them to fence in the burying-ground upon this common land at their own cost. It fully appears from this, that the inhabitants of this particular part of the town did not understand that they had acquired any particular, distinct, independent'right or title to this common land, but that the right and title to the same still belonged to the town; and that the town regarded this common land as still belonging to them, is manifested by their vote, giving leave to the neighborhood to fence in the burying-ground.
In 1769, the town voted to that part of the town, in which this piece of common land was situated, two acres of it, “ to build a meeting-house upon, and for convenience of said house.” This was a pretty decided act of ownership on the part of the town, and seems to have been done in expectation of the formation of a new parish. The inhabitants, by accepting this grant as they did, distinctly recognize the right of the town. In the course of the year 1769, a new parish was legally incorporated by an act of the legislature, embracing within its limits all the common land described in the vote of the town in 1741 as intended for the use of that part of the town, and of which the locus in quo forms a part. After the incorporation of this parish, no doings of the town in regard to this piece of common land appear upon the records, *247 until the 2d of March, 1807, when there is the following record : —
“ 8th. To see if the town will confirm to the several parishes the common land that is within the limits of each parish respectively, except the ground necessary to mend the highway.
“• Whereas it has been understood that there was a former vote confirming and giving to each parish the common lands lying and being within the limits of each, but that vote does not appear in the records, and as the several parishes have acted upon said vote supposing that, the same was on record; therefore voted, in conformity to the eighth article of the warrant, that each parish retain the common lands belonging to them as heretofore understood, excepting their leaving lands sufficient where a road is necessary to be made of three rods wide; and where there is gravel, that a sufficient quantity be left to mend said roads; also reserving sufficient lands for the training fields in each parish.”
Here is a vote of a very different character from that of 1741. This does not relate to the use to be made by the town of this parcel of land, but distinctly recognizes a previous absolute gift and grant of the land itself to the parish, and now fully and absolutely confirms and establishes such absolute gift and. grant. That a good title in fee maybe conveyed by such a vote, without seal and without consideration, is the well established law of this commonwealth. Springfield v. Miller, 12 Mass. 417; Thomas v. Marshfield, 10 Pick. 367. The town manifestly had the fee in the land and the power to convey it to the parish, the parish was a legal corporation with capacity to take the fee of the land as grantee for parish purposes, and the vote of the town was sufficient to convey the fee. A perfect title in fee of all this parcel of common land, including the locus in quo, is thus clearly traced into the parish.
But it was said in argument, that this was at most a grant of the common land, but that the burying-ground, upon which the locus in quo was situated, had been fenced off and separated from the common land, and did not form a part of it, *248 and so did not pass by this grant. But such is not the true construction of that vote.
The burying-ground was in fact a part of the common land, had always been treated and spoken of as part of the common land, the town gave leave to use a part of the common land as a burying-ground, and in granting to the parish the common land in general terms, the town no doubt intended to include the burying-ground and the locus in quo upon it as a part of the common land. It can hardly be supposed, that the town intended to give to the parish a title to the rest of the common lands, and withhold from them a right to their burying-ground, which was a part of the common land.
It was further said in behalf of the plaintiff, that all this land of the parish had been conveyed to a board of trustees of a bainisterial fund, and that these trustees therefore had the title. But if the deed to this board of trustees was sufficient to pass any title to this land, it would avail nothing in this case, as the act of the legislature establishing this board of trustees had been repealed and the board abolished, so that in fact, at the time of the acts complained of, there were no trustees in whom any title could be vested.
In addition to holding the legal title, it appears abundantly from the evidence, that the parish, from the time of its incorporation, had the actual possession and control of all this parcel of common land, including the burying-ground and the locus in quo. The records of the parish from the first, down to the commencement of this suit, show frequent, repeated, continued and unquestionable acts of ownership and control, on the part of the parish, of all this common land including the burying-ground, such as fencing the burying-ground, feeding and cutting the grass, selling and taking off wood, leasing portions of it from time to time and receiving the rent, placing a pound upon it and keeping it in repair, placing a hearse-house upon it, placing the old meeting-house on a part of it, appropriating a part of it for a parsonage, and when a turnpike was made through it, the parish claimed and received the damages as owners of the land.
It is unnecessary to give a more particular and detailed *249 account of these acts of the parish, which extend through a large number of years, and were acts of a decisive character as manifesting actual possession and ownership. It does not appear that the parish was ever disturbed in their possession of this land by the town or by any one, or that their right to it was ever called in question by any one before the controversy which gave rise to this suit.
The plaintiff now claims a right to a portion of this land, as against the parish, but he shows no paper title, claims under no vote, or deed or conveyance, but relies wholly upon an alleged exclusive and adverse possession as giving him a title to the locus in quo. He does not claim the land itself, but an easement in it or right to use it. Upon what principle an exclusive adverse possession of a defined piece of land would give a party an easement in the land and not the land itself does not appear. The plaintiff in fact had a horse-shed upon a part of this common land, for his accommodation in attending public worship at the parish meeting-house, and claims that he had the right to keep it there against „the parish; and this suit is brought against the defendants for removing the sheds by the direction and authority of the parish. It appears that shortly after their act of incorporation the parish erected a meeting-house, or perhaps completed one partly erected before, and several parishioners erected horse-sheds for their accommodation in the rear of the meeting-house, and among others the plaintiff’s father had a shed, which was occupied by him and the plaintiff. In regard to the circumstances under which these sheds were thus early erected there is no evidence. But in 1801 and subsequent years, other parishioners desiring to be accommodated with sheds, there are several votes of the parish, in different years, giving permission to numerous different parishioners to erect sheds in a line with the old sheds. By the first direct evidence, therefore, which we have on this subject, we find the parish claiming and exercising the right of directing in regard to these sheds and the parishioners recognizing that right. But these first sheds were all blown down and destroyed bj the great gale in 1815. The shed which forms the subject of *250 this controversy was erected subsequently to this time, and upon other and different ground from that on which the old shed stood, and the circumstances, under which this and all the other new sheds were erected, appear clearly by the evidence. The parish, being about to erect a new meeting-house, concluded not to place it on the site of the old one, but in a new situation, in which it would be incommoded by rebuilding the sheds on the spot where they were originally placed. The parish, therefore, on the 6th of October, 1815, passed the following vote, to wit: “Voted, That the parish do not give liberty to the proprietors of the old horse houses to erect them again on the parish ground where they formerly stood.”
This vote directly asserts the right of the parish to the ground on which those old sheds stood, and the right to prohibit all persons, including the plaintiff, from erecting sheds on that ground. The right thus asserted by the parish appears to have been assented to by all the parishioners, the plaintiff with the rest. There is nothing to show that the plaintiff or his father made any resistance to this prohibition, or asserted any claim of right as against the parish to place their shed on the ground where it originally stood.
It is fairly to be inferred from these facts that the old sheds were placed on the ground where they originally stood, by the license and permission of the parish, and not upon any claim of right on the part of the plaintiff or his father, or of any others of the parishioners.
At a parish meeting in November, 1815, the parish passed the following vote: “Art. 5th. Voted, the above committee select places on the parish ground where the shed owners and others may erect sheds if they choose, and report as soon as may be.” This committee reported as follows: “ The most suitable ground for the erection of sheds is on the northerly side of the spot designated as above for the meeting-house, beginning at a stake near the turnpike, running westerly, as far as necessary to accommodate every person who may wish to erect a shed near the meeting-house. The sheds, to stand nearly parallel with the meeting-house, thirty-five feet from said house.” This report was accepted. Another committee duly appointed *251 by the parish, for the purpose of taking into consideration, among other things, “ what further measures the parish will take respecting the erecting sheds near the meeting-house,” reported among other things, “ that the probable expense to level and prepare the ground, to erect said house and for the sheds to stand on, will not exceed three hundred dollars.” This report was accepted. At a parish meeting on the 5th of October, 1816, there is the following record, to wit: “ Voted, that the parish assessors be a committee to give permission and direction where people may erect sheds near the meetinghouse.” “ At the adjournment of this meeting to the 14th instant, it was voted, that the meeting-house agents be also a committee jointly with the assessors, and voted to add four more to the committee, all for the above purposes.”
It appears by the evidence, that this committee performed the duty assigned them, and that the sheds, including the plaintiff’s, were built by the permission and under the direction of this committee, acting for the parish. In fact it appears from the evidence, that the plaintiff himself has fully admitted that his shed was erected by the permission and under the direction of the parish, but he insists that notwithstanding this he had acquired an easement in the land or the right to keep his shed there by possession.
The law upon this subject is very clear and well settled. An adverse right of an easement cannot grow out of a mere permissive enjoyment. First Parish in Medford v. Pratt, 4 Pick. 228; First Parish in Gloucester v. Beach, 2 Pick. 60, note. The present case comes most clearly within this principle. The plaintiff occupied his shed by the permission, the leave, of the parish. The erection of the sheds was a parochial business and affair, as much as the erection of the meeting-house. The plaintiff had no better right to his shed, than the other parishioners had to their sheds. It would be in violation of the plainest principles of right and justice to allow the owners of sheds, after having placed them on the parish ground by the permission and subject to the control of the parish, to rise up and throw off the control of the parish and set them at defiance.
A. H. Nelson and A. A. Prescott, for the plaintiff.
R. Choate and C. P. Judd, for the defendants.
But it was said that the plaintiff, at a certain period and by reason of certain acts, became a tenant at sufferance, and as such, that his possession was adverse. But there surely was no relation of landlord and tenant, no tenancy of any sort, between the parish and the occupants of the shed, the parish permitting the parishioners to place their sheds on the parish ground merely as a matter of accommodation and favor. No right or title to, or easement in, the land could be acquired by such an occupation. The plaintiff having placed his shed on the parish ground by the permission and leave of the parish, the parish had a right at their pleasure to revoke that permission and leave, and require the plaintiff to remove his shed. The parish did revoke their permission and leave, of which due notice was given to the plaintiff, and he was in due and proper form required to remove his shed, which he failed and refused to do. The parish, therefore, had a clear right to remove the shed, and the defendants, acting under the authority and by the direction of the parish in removing it, were clearly not liable to this action.
It is not necessary to go into any consideration of the facts put into the case, in regard to the transactions between the parish and the school district, as those facts have no material bearing upon this case, which involves merely a question of right between the plaintiff and the parish.

Plaintiff nonsuit